UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAMIA TIFFANY GAMET,

                Petitioner,

v.                                    Case No. 17-cv-14172
                                    HON. MARK A. GOLDSMITH

JEREMY HOWARD,[1]

                Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT
OF HABEAS CORPUS, DENYING CERTIFICATE OF
APPEALABILITY, AMENDING CASE CAPTION, AND
<u>GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL</u>**

Camia Tiffany Gamet, a prisoner in the custody of the Michigan Department of Corrections, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. She challenges her state-court conviction for first-degree murder.

For the reasons explained below, the Court denies the petition. The Court denies a certificate of appealability, and grants Gamet leave to proceed on appeal in forma pauperis.

## I.    BACKGROUND

Gamet's conviction arises from the murder of Gamet's boyfriend Marcel Hill in Jackson, Michigan. The Michigan Court of Appeals provided a comprehensive summary of the testimony leading to Gamet's convictions:

> On May 18, 2013 at approximately 3:00 a.m., several 911 calls from the same number alerted police to 714 Lansing Avenue, Apartment 2. The caller advised that a man was bleeding. [The calls were played for the jury.] When police arrived at

---

[1] The proper respondent in a habeas case is the custodian of the facility where the petitioner is incarcerated. See Rule 2(a), Rules Governing Section 2254 Cases. Gamet is presently incarcerated at the Huron Valley Correctional Facility where Jeremy Howard is the warden. The Court directs the Clerk of Court to amend the case caption to substitute Jeremy Howard as the respondent.

the apartment, it was obvious that a struggle had taken place in the living room; chairs were knocked over, lamps were broken and the apartment looked "completely ransacked." The victim was found dead on a deflated air mattress on the floor. Officers asked dispatch to "ping" the 911 caller's cell phone, which led to defendant's arrest. Although defendant told officers that she was on her way home from a friend's house, they noticed that there was blood on her shoes. Defendant did not have a cell phone on her, but officers located the cell phone and battery in the area of 714 Lansing with help from the canine unit; the cover for the phone was missing and was later found in defendant's bra. Defendant was not visibly injured except for a small cut on her left hand. She had cuts and dried blood on the bottom of her feet.

Michelle Winters lived in the apartment right below the victim and defendant. They had only lived there for approximately two weeks before the victim was murdered. Winters worked nights but was still able to hear the victim and defendant fight. One time Winters heard defendant say to the victim, "go ahead and hit me," but Winters never saw the victim strike defendant. One time their fighting caused damage to Winters' apartment. When Winters confronted them, the victim apologized and said that they were probably going to be evicted anyway. On the day before he was murdered, the victim asked Winters to come and look at how clean his apartment was. He borrowed Winters' phone because defendant had taken his. Winters overheard the victim tell someone that he hated that "f* * * *ing b* * * *."

Melissa Olmstead testified that she lived in a studio apartment right across from where the victim and defendant lived. The victim had moved into his apartment and defendant moved in with him approximately one week before he was murdered. The victim was nice "but mentally challenged." Olmstead woke up on May 18th at approximately 1:30 a.m. thinking that someone was breaking into her house because she could hear glass breaking. When Olmstead looked out her window into the victim's apartment she could see defendant throwing dishes at the victim. The victim was slouched on the floor with his arms in front of his face screaming "stop hitting me." This went on for about an hour. Olmstead saw defendant get a glass of water and then turn the lights off. She did not appear to be injured or upset.

The medical examiner testified that the victim had therapeutic levels of a number of drugs in his system, as well as marijuana, cocaine and alcohol. The victim had 11 sharp force injuries to his head, chest, back and arms. One of the stab wounds hit his heart and perforated his lung, causing blood to leak into his chest cavity. Another of the wounds was to the victim's back and also perforated the lung. There were a total of three wounds to the back of the victim's body. The victim also suffered from blunt force trauma. There was a gaping laceration above his right eye. There was also a gaping laceration to the back of the victim's head. There were at least two injuries to the back of the victim's head. The victim also had defensive wounds. The cause of death was multiple sharp force and blunt force injuries and the manner of death was homicide.

2

There was evidence regarding the parties' relatively brief, though tumultuous relationship.  Jackson Police Officer Matthew William Beard testified that he had previous contact with defendant and the victim on New Year's Eve of 2012. Defendant had called 911 a number of times that weekend but the victim left the scene before police arrived. But on that New Year's night, both of them were present. They appeared to be hot and sweaty and both had minor injuries. Defendant reported that she held the victim down so he could not leave before police arrived. Defendant appeared to be the stronger of the two. Neither were prosecuted.

Dr. Karen Gilbert testified that she treated the victim for a head injury on March 8, 2013.  The victim reported that his girlfriend had hit him in the back of the head with a hammer.  He needed staples, but did not have internal injuries.  Gilbert noted that the victim had also been treated at the hospital on March 3, 2013 for a collapsed lung and sutures to his chest.  The victim told Gilbert that the prior injury was from a stab wound.  The victim told the previous treating physician that the wound was from a fall down the stairs and landing on a nail.

Barbara Johnson testified that the victim was her younger cousin. The victim was "behind" and "a little slower."  He also walked differently—by kicking forward like a horse.  Johnson described the victim as "like a child."  On March 8, 2013 the victim came to Johnson's house and reported that defendant had hit him in the head with a hammer.  Johnson took the victim to give a written statement to police. The statement read: "She [defendant] came in around or about 4:00 a.m.  She was high on crack and drunk on alcohol. ... I am very afraid of Camia Gamet. She has assaulted me tonight with a hammer....She has hit me in the head ... I asked her to leave and she wouldn't, so I left and made contact with my cousin, Barbara Ann Johnson."  ...

The officer who responded to the victim's complaint regarding the hammer incident found defendant at the apartment, passed out and incoherent.  A hammer was lying next to her that had blood on it. Defendant reported that the victim had come at her and she was defending herself.  The case against defendant was ultimately dismissed because the victim wrote a letter indicating that he could not be sure that it was defendant that had hit him with a hammer.

Diana Banks-Joiner testified that the victim was her nephew and she helped raise him.  The victim had mental problems and had a hard time keeping up with Banks-Joiner's other children.  He suffered from fetal alcohol syndrome and scoliosis, which made him walk differently.  The victim attended special education classes and graduated from high school.  He received SSI but also tried to work.  The victim did not have trouble with his bank account until he met defendant, at which time he would be overdrawn on his account.  Banks-Joiner believed defendant controlled the victim.

Banks-Joiner testified that she saw the victim suffer from a number of injuries once he began seeing defendant.  She also testified that the victim told her that defendant had stabbed him in the abdomen and then sewn the wound shut with thread.  Defendant casually noted that she had not intended to cut the victim that deeply.  On another occasion, defendant punctured the victim's lung and recorded hospital footage of a doctor treating the victim.  Banks-Joiner told the victim "this girl is going to kill you and you need to get away from her."  Two weeks before he died, the victim called Banks-Joiner and said he was afraid of defendant. ...

Sharmika March was Banks-Joiner's daughter and the victim's cousin.  March testified that the victim was cognitively impaired and "struggled with everyday perception" and living independently.  He always needed assistance with everyday things.  He had scoliosis and also suffered from meningitis.  He walked "funny."  March testified that "[y]ou could look at him and tell that there may be some things wrong with him." The victim had a large head and his eyes were far apart.  At one point, March was his payee. ... In the spring of 2013, the victim asserted that he wanted control of his own money.  The office approved it, but March did not agree with that decision. Defendant became the victim's "chore provider" in August 2012, entitling her to some of his SSI benefits.  The victim had written a letter to terminate defendant as his chore provider shortly after the hammer incident, but then reneged on the letter almost immediately after defendant posted bond.  After his death, March learned that the victim had been taking payday loans.

When the victim started seeing defendant, March was worried: "I had concerns with someone who presented so well what her motive was with someone of his stature."  There was definitely a "mismatch."  March noticed injuries on the victim after he began his relationship with defendant, which the victim would laugh off.  After the injury to his head, the victim was admitted to a facility for suicidal thoughts.  March was particularly disturbed when she confronted the victim about the hammer attack because the victim said that if defendant wanted to really hurt him or kill him she would have just kept hitting him.  Like the others, March warned the victim that defendant would kill him one day.

The victim had been attending New Vision to work on life goals, including mental health appointments and PT for his scoliosis. His case manager, Sheila Lorenz, testified that the victim had a borderline IQ. He walked with a cane and had a limp.  He received SSI for cognitive impairment.  Lorenz testified that she questioned the match between the victim and defendant, but that the victim craved "normalcy," which included having a girlfriend.  The victim reported that he and defendant argued and, on one occasion, showed Lorenz where defendant had stabbed him and sewn him up.  He also reported another incident where defendant stabbed him and he had to go to the hospital.  The victim reported a third incident in which defendant hit him in the head with a hammer.  The victim told Lorenz that defendant loved him and did not want him to leave.  Lorenz warned the victim that if the relationship continued, defendant would kill the victim.

4

The lead detective on the case, Gary Schuette ... interviewed defendant about the murder and her statement was played for the jury. Defendant's name was on the mailbox and she had a library card there, establishing residence. Defendant denied knowing anything about how the victim was killed. She denied any wrongdoing.

Schuette testified that defendant had a prior conviction in Ohio for domestic violence. Defendant made threatening calls to kill a former boyfriend. Defendant was arrested a few weeks later in May 2007 for attempting to assault her boyfriend with a fire extinguisher. Defendant allegedly picked up her six week old baby in a car seat and threw it at him.

Alfred Cavasin testified that he was a private investigator hired by defense counsel. When Cavasin interviewed defendant in January 2014, she told him that on the night in question, she and the victim had been drinking and using drugs. She went out and got them food and when she returned the victim was angry. Defendant went to bed and the next thing she remembered was a glass table being broken above her head. She reached for her purse to call 911 or for the lamp to turn a light on. She swung the lamp around. Defendant then felt a knife on the floor. She stabbed until the attack was over. When she turned on a light, she realized that the victim was dead. She called 911 a number of times while hiding out of sight.

Following an unsuccessful motion for a directed verdict, defendant presented her own witnesses. Derek Drummond testified that he and defendant had children together. He was the victim in defendant's prior Ohio court cases on April 18, 2007 and May 2, 2007, but testified that he was the one who beat defendant on those occasions. He denied that defendant ever harmed or threw their children. He indicated that the individual who made the accusation had a vendetta against defendant. Drummond testified that he beat defendant "the whole time" they were together, which was approximately two and a half years.

Defendant testified that she was 31 years old. Defendant was originally born in Jackson, Michigan, but was removed from her parents' care. She spent much of her life in foster care and juvenile homes in Iowa until she was 16, at which time she returned to Michigan in an attempt to make contact with her biological family. It was at that time that she met the victim. He bought cocaine at a house where she used to stay. Defendant left Michigan again and returned a number of years later. In June 2012, she saw defendant riding his bicycle and recognized him. Although they were not "together," defendant moved in with the victim very shortly after reconnecting. With the exception of one month the victim spent at rehab, they lived together continuously. They drank on a daily basis. They also did drugs. Defendant testified that she had post-traumatic stress disorder, major depression, bipolar disorder, ADHD, and anti-social personality disorder. She had a case manager at Segue.

Defendant testified that she and the victim had a "rocky" relationship but they were planning on getting married and defendant was dedicated to the relationship.

5

Defendant testified regarding an incident at the victim's cousin's house where he had been drinking. The victim was cursing and calling defendant names. He punched her and she slapped him. On the night of the murder, the two of them had been using drugs and drinking. She and the victim had fought earlier in the day. Other than coming home and giving the victim some food and then going to bed, defendant had no recollection of the remainder of the events that took place earlier in the day. Defendant went to bed on the inflatable mattress. Defendant woke up "to the sound of glass shattering over my head." It was "pitch black" in the room. Defendant was startled and confused and could feel "someone" hitting her repeatedly in the back of her head. Defendant jumped up and reached for the lamp. The lamp came apart in her hands, so she began to swing it. Defendant fell on her knees and was feeling around for her purse and cell phone when her hand touched the knife she had used to hang up curtains. At one point, defendant heard a voice say, "B* * * *, I'm going to kill you." Defendant was scared because she did not recognize the voice. The person was still striking defendant so she struck out with the knife several times. The person fell, defendant dropped the knife, and then went to find a light source. After turning on the bathroom light, she saw that it was the victim. She tried yelling his name and then went outside to call 911. She had to call four times. Defendant explained that she did not tell 911 her name because she "realized that something serious had happened and after I saw that it was him I wanted to help him." Defendant dropped the phone and was trying to find it, but was too drunk. Defendant denied knowing the victim was dead before she left the apartment.

Defendant remembered being arrested and taken to the police station and sleeping for hours. Her feet were bleeding from cuts she sustained in the apartment. Her legs were also cut and she had "a little bit of injuries on [her] arms." No one ever checked her or treated her for her injuries. Defendant admitted that she was not honest during her interrogation. She explained: "I kept telling him I wanted to leave because I wanted to see if Marcel was okay, so I was trying to tell [the detective] something in order for him to let me leave." Once she heard that the victim was dead, defendant was "heartbroken" and in "denial." Defendant explained that she threw the table and chairs in the interrogation room because she was drunk and upset. Defendant's motto was "you don't talk to police," and, had defendant not been drunk, she would not have spoken to the officer.

Defendant testified that her only source of income was as the victim's chore provider. The victim removed defendant as his chore provider a few months earlier. He was in the process of reappointing her his chore provider when he died. She was not his payee and never had authority over his accounts. Defendant testified that the victim "did not have any physical limitations" and "was far from cognitively delayed or anything of that sort."

Defendant denied hitting the victim in the head with a hammer in March 2013: "I do not know how he received his injuries to his head as he did not know. Which is why the case was dismissed." Defendant also denied previously stabbing the

6

victim: "The injury that [the victim] received he had to receive a chest tube and those were the threads that he was showing people and saying that I stitched up." She believed the victim received the wound when he fell down the stairs.

The jury convicted defendant of first-degree murder. Defendant was sentenced to life without parole.

People v. Gamet, No. 324181, 2016 WL 555850, at *1–6 (Mich. Ct. App. Feb. 11, 2016).

Gamet filed an appeal of right in the Michigan Court of Appeals. She raised these claims through counsel and in a pro per supplemental brief: (i) the evidence was insufficient to support her conviction; (ii) her custodial statement was improperly admitted; (iii) the admission of other acts evidence violated her right to a fair trial; (iv) she was denied her right to present a defense; (v) inadmissible hearsay prejudiced the defense; (vi) she received ineffective assistance of defense counsel; and (vii) the jury instructions were inadequate. The Michigan Court of Appeals affirmed Gamet's conviction. Id.

Gamet filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims raised in the Michigan Court of Appeals. The Michigan Supreme Court denied leave to appeal. People v. Gamet, 885 N.W.2d 282 (Mich. Feb. 11, 2016) (mem.).

Gamet then filed a petition for writ of habeas corpus in this Court (Dkt. 1) and a motion to stay proceedings and hold habeas petition in abeyance (Dkt. 3). The Court granted the motion to stay to allow Gamet to exhaust claims in state court and imposed conditions under which she was required to proceed (Dkt. 9).

Gamet filed a motion for relief from judgment in the trial court, raising five claims: (i) the prosecutor committed misconduct; (ii) the trial court engaged in misconduct; (iii) police tampered with evidence and gave false testimony at trial; (iv) trial counsel was ineffective; and (v) appellate counsel was ineffective. The trial court denied the motion (Dkt. No. 22-24, PageID.2062–2063). The Michigan Court of Appeals denied leave to appeal because Gamet "failed to establish that

7

the trial court erred in denying the motion for relief from judgment." People v. Gamet, No. 348196 (Mich. Ct. App. July 26, 2019) (unpublished decision). The Michigan Supreme Court denied leave to appeal because Gamet "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." People v. Gamet, 937 N.W.2d 668 (Mich. 2020) (mem.).

Gamet claims that in 2020, she tried to file pleadings in state and federal court, but they were never received. First, she claims that she filed a motion for new trial in the trial court in February 2020, but the filing was not received by the trial court (Dkt. 14, PageID.257). She also claims that she attempted to file a motion to lift stay and reopen this case on April 20, 2020, but that the filing was not received by the Court (see Dkt. 16, PageID.348, Dkt. 14, PageID.240-243).

On April 15, 2021, Gamet filed a motion for new trial and motion to disqualify the judge in the trial court. The trial court denied the motion to disqualify on May 12, 2012, and denied the motion for new trial, which it deemed to be a successive motion for relief from judgment on October 19, 2021 (Dkt. 22-24, 22-25). The Michigan Court of Appeals denied Gamet's application for leave to appeal pursuant to Mich. Ct. R. 6.502(G). People v. Gamet, No. 360859 (Mich. Ct. App. July 1, 2022) (unpublished decision). The Michigan Supreme Court denied leave to appeal because the motion was prohibited by Mich. Ct. R. 6.508(D). People v. Gamet, 981 N.W.2d 486 (Mich. 2022) (mem.).

Gamet claims that, in April 2022, she discovered that her motion to lift stay and reopen this case—purportedly filed in April 2020--had not been filed. (Dkt. 16, PageID.348). In May 2022, Gamet then filed another motion to lift the stay and reopen the case which this Court granted on March 7, 2023. (Dkt. 16, PageID.349). The Court ordered Gamet to file an amended petition within 60 days of the Court's order.

Gamet's amended habeas petition was filed on May 4, 2023.  (Dkt. 18).  The petition raises the following claims:

I.     Detective Schuette's tampering with evidence from the crime scene and false testimony at trial violated Petitioner's V and XIV amendment due process rights to a fair trial.

II.     The prosecution violated Petitioner's V and XIV amendment due process rights by the improper objection to defense witnesses which denied the Petitioner's right to present a defense as well as attempting to mislead the court by claiming to be unaware of Petitioner's self-defense theory.  By improper introduction of false allegations, the cumulative effect was unfairly prejudicial requiring reversal of Petitioner's conviction.

III.     The trial court improperly ruled that the doctrine of forfeiture by wrongdoing test had been met, therefore violating Petitioner's VI amendment right to confrontation by the admission of inadmissible testimony.

IV.     Petitioner was denied the effective assistance of counsel guaranteed by the constitutional VI amendment.

V.     The trial court demonstrated judicial bias and abuse of discretion as well as violated right to present a defense by permitting a self-defense instruction to be read to the jury but did not permit defense witnesses to testify in support of this theory, violating Petitioner's V, VI, and XIV amendment rights and the right to a fair trial.

Respondent filed an answer arguing that the petition should be denied because Gamet failed to comply with the conditions of the stay (Dkt. 21).  Respondent also argues that Gamet's first claim is barred by the statute of limitations, her first, second, and fifth claims are procedurally defaulted, and all her claims are meritless.

## II.   ANALYSIS

### A. Legal Standard

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, imposes "important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases."  Shoop v. Hill, 586 U.S. 45, 48 (2019).  A federal court may grant habeas corpus relief only if the state court's

9

decision "resulted in a decision that was contrary to, or involved an unreasonable application of," Supreme Court precedent that was "clearly established" at the time of the adjudication.  28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 405–406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409.  To obtain habeas relief in federal court, a state prisoner must show that the state-court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011)

A state court's factual determinations are presumed correct on federal habeas review. See 28 U.S.C. § 2254(e)(1).  A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence.  Id.  For claims that were adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

### B.   Compliance with July 13, 2018 Order

As an initial matter, Respondent maintains that Gamet's petition should be denied because she failed to comply with the terms of the Court's order granting her motion to stay.  The Court imposed conditions to ensure that Gamet did not delay, either in exhausting state court remedies or in returning to this Court.  Gamet's compliance with the conditions of the stay is not a

10

jurisdictional question and the Court determines that it is more efficient to proceed directly to the merits of the petition.

### C.  Claim One: Police Misconduct

In her first claim, Gamet argues that police detective Gary Schuette destroyed evidence and gave false testimony.  Respondent argues that this claim is untimely, procedurally defaulted, and meritless.

A one-year limitations period applies to federal habeas corpus petitions filed by state prisoners.  28 U.S.C. § 2244(d)(1); Hubbard v. Rewerts, 98 F.4th 736, 742 (6th Cir. 2024), cert. denied sub nom. Hubbard v. Tanner, 145 S. Ct. 1201 (2025).  This limitations period runs from the latest of four dates—the relevant period for Gamet's petition is "the date on which [her] criminal judgment became final by the conclusion of direct review [of her conviction and sentence] or the expiration of the time for seeking such review."  See 28 U.S.C. § 2244(d)(1)(A); Hubbard, 98 F.4th at 742. The limitations period is tolled during the time in which "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  See 28 U.S.C. § 2244(d)(2).

Gamet's direct appeal of her conviction concluded on September 27, 2016, when the Michigan Supreme Court denied her application for leave to appeal.  People v. Gamet, 885 N.W.2d 282 (Mich. 2016).  Gamet had ninety days from this date to file a petition for a writ of certiorari with the United States Supreme Court, which she did not do.  Therefore, her conviction became final on December 27, 2016, when the ninety-day period expired. See Lawrence v. Florida, 549 U.S. 327, 333 (2007); Bronaugh v. Ohio, 235 F.3d 280, 283 (6th Cir. 2000).  Gamet had until December 27, 2017, to timely file a § 2254 petition.  Gamet filed her original federal habeas

11

petition on December 21, 2017, that is, with six days remaining of the limitations period.  It is undisputed that the claims from this initial petition are timely.

On December 21, 2017, Gamet also filed a motion to stay the proceedings and hold his petition in abeyance (Dkt. 3).  The Court granted Gamet's motion, stayed the proceedings, and administratively closed the case on July 13, 2018 (Dkt. 9). While the one-year period was tolled as to the claims contained in the original petition, it was not tolled for any other claims.  See Duncan v. Walker, 533 U.S. 167, 181–182 (2001) (ruling that a federal habeas petition does not statutorily toll the one-year period).  Gamet's state post-conviction motion filed in September 2018 did not toll the running of the statute of limitations because the applicable one-year period under § 2244(d)(1) already had expired.  See Parker v. Renico, 105 F. App'x 16, 18 (6th Cir. 2004) (citing McClendon v. Sherman, 329 F.3d 490, 494 (6th Cir. 2003)).  The state petition also did not restart the limitations period.  See Eberle v. Warden, Mansfield Corr. Inst., 532 F. App'x 605, 609 (6th Cir. 2013) (citing Vroman v. Brigano, 346 F.3d 598, 602 (6th Cir. 2003)).  Thus, the one-year limitations period expired as to any claims not included in the original petition on December 27, 2017, unless those claims "relate back" to the original petition or are subject to statutory or equitable tolling.  See Simmons v. Winn, 361 F. Supp. 2d 719, 739 (E.D. Mich. 2019) (supplemental habeas claims filed after the one-year expired were untimely unless they related back to the original petition).

Under Federal Rule of Civil Procedure 15, an amended pleading "relates back" to the original pleading only if the amended claims are tied to the "same core of operative facts" alleged in the original petition.  Mayle v. Felix, 545 U.S. 644, 664 (2005).  "An amended habeas petition ... does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original

12

pleading set forth." Id. at 650. An amended petition does not relate back to an original petition just because both petitions arise from the same trial and convictions. Id. This is so because, if "claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance." Id. at 662.

Gamet's original petition raised claims concerning the admission of evidence, the exclusion of evidence, the doctrine of forfeiture by wrongdoing, judicial bias, counsel's performance, and the sufficiency of the evidence. Gamet's police misconduct claim does not arise from the same set of operative facts as the claims in her original petition. This claim therefore does not relate back to the original petition and is untimely.

Gamet is not entitled to equitable tolling of the limitations period. The one-year statute of limitations is not a jurisdictional bar and is subject to equitable tolling where a habeas petitioner shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). Equitable tolling is applied "sparingly," and Gamet bears the burden of proving that she is entitled to it. See Robertson v. Simpson, 624 F.3d 781, 784 (6th Cir. 2010).

Gamet neither alleges nor establishes that she is entitled to equitable tolling of the one-year period. See e.g., Keeling v. Warden, Lebanon Corr. Inst., 673 F.3d 452, 464 (6th Cir. 2012) (pro se status is not an extraordinary circumstance); Allen v. Yukins, 366 F.3d 396, 403 (6th Cir. 2004) (ignorance of the law does not justify tolling)).

Actual innocence may "serve[] as a gateway through which a petitioner may pass" when his petition is time-barred. McQuiggin v. Perkins, 569 U.S. 383, 386 (2013). A credible claim of

13

actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence−whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence−that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). Gamet makes no attempt to support an actual innocence claim.

Equitable tolling is not warranted and the petition is untimely.

### D. Claim Two: Prosecutorial Misconduct

In her second claim, Gamet argues that she was denied a fair trial by the prosecutor's misconduct. She alleges that the prosecutor: (1) claimed to be unaware of the defense theory of self-defense, (2) improperly objected to her efforts to introduce evidence of the victim's aggressive character, and (3) introduced evidence of prior domestic violence charges for which she had been acquitted.

Respondent argues that this claim is procedurally defaulted. A claim is procedurally defaulted when (1) the petitioner fails to comply with a state procedural rule, (2) the state courts actually relied on the rule, and (3) the rule is an adequate and independent state ground. White v. Mitchell, 431 F.3d 517, 524 (6th Cir. 2006). To determine whether the state court relied on a procedural default, a court looks to the last reasoned decision. Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991).

Here, the trial court denied relief under Mich. Ct. R. 6.508(D)(3) (Dkt. 22-24, PageID.2062-63). That rule bars post-conviction review of claims that could have been raised on direct appeal absent a showing of cause and prejudice. Mich. Ct. R. 6.508(D)(3). Enforcement of Rule 6.508(D)(3) is an independent and adequate state ground sufficient to invoke the procedural default bar. Amos v. Renico, 683 F.3d 720, 733 (6th Cir. 2012). Accordingly, Gamet's prosecutorial misconduct claim is procedurally defaulted.

14

A procedurally defaulted claim is barred from federal habeas review unless a petitioner establishes either (1) cause for the default and prejudice from the alleged constitutional violation, or (2) that failure to consider the claims would result in a "fundamental miscarriage of justice." See Coleman v. Thompson, 501 U.S. 722, 750 (1991).  Gamet satisfies neither exception.

### 1.  Cause and Prejudice

Gamet argues that appellate counsel's ineffectiveness establishes cause to excuse the default.  Appellate counsel's failure to raise a claim on direct appeal may serve as cause to excuse a procedural default if the failure rises to the level of ineffective assistance of counsel.  Murray v. Carrier, 477 U.S. 478, 488-89 (1986).

To establish ineffective assistance of counsel, a petitioner must show that her attorney performed deficiently, and that the deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984). An attorney is deficient if the attorney's representation "fell below and objective standard of reasonableness," as defined by "prevailing professional norms."  Id. at 688.  A petitioner is prejudiced by her attorney's errors if there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  Appellate counsel is not required "to raise every non-frivolous issue on appeal." Caver v. Straub, 349 F.3d 340, 348 (6th Cir. 2003) (citing Jones v. Barnes, 463 U.S. 745, 751–752 (1983)).  Indeed, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail."  Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Barnes, 463 U.S. at 751-752).  To demonstrate deficient performance, Gamet must show that the omitted claim is "clearly stronger" than the claims raised on direct review.  Monzo v. Edwards, 281 F.3d 568, 579 (6th Cir. 2002).  Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang

15

winner," that is, an issue that was "obvious from the trial record" and "would have resulted in a reversal on appeal." Meade v. Lavigne, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

When ineffective assistance of appellate counsel is asserted as cause to excuse a procedural default, the ineffective assistance claim is reviewed de novo. Chase v. MaCauley, 971 F.3d 582, 591-92 (6th Cir. 2020).

Gamet has not shown that appellate counsel was ineffective because none of the alleged instances of prosecutorial misconduct were clearly stronger claims than those raised on appeal. See Wallace v. United States, 43 F.4th 595, 603 (6th Cir. 2022) (holding that when ineffective assistance of appellate counsel is advanced as cause to excuse a procedural default, the court "must oddly consider the validity of [the defaulted] claim—the very claim that he procedurally defaulted—to decide whether his appellate counsel provided ineffective assistance (and whether we may consider this claim despite that default).").

First, Gamet challenges the prosecutor's question to Detective Scheutte suggesting that the prosecution did not learn of the self-defense theory until shortly before trial. The record shows that Gamet asserted self defense months earlier. Although the prosecutor's phrasing could have been more precise, the isolated question does not approach the level of misconduct that "so infected the trial with unfairness" as to deny due process. Darden v. Wainwright, 477 U.S. 168, 181 (1986). Appellate counsel was not ineffective for declining to raise a claim based on this isolated question.

Second, Gamet claims that the prosecutor committed misconduct by objecting to her attempts to introduce character evidence regarding the victim's alleged aggressiveness. In substance, this argument challenges the trial court's evidentiary rulings. Webb v. Mitchell, 586 F.3d 383, 397 (6th Cir. 2009). "A prosecutor may rely in good faith on evidentiary rulings made

16

by the state trial judge and make arguments in reliance on those rulings." Cristini v. McKee, 526 F.3d 888, 900 (6th Cir. 2008).  Appellate counsel reasonably declined to pursue this claim.

Third, Gamet argues that the prosecutor improperly introduced evidence of domestic violence charges of which she had been acquitted.  The trial court ruled the prior convictions relevant and admissible.  Appellate counsel directly challenged the trial court's ruling on direct appeal.  The Michigan Court of Appeals affirmed the trial court's evidentiary ruling. Gamet, 2016 WL 555850 at *11.  Gamet has not shown that the prior acts evidence was false or that its admission constituted prosecutorial misconduct distinct from the evidentiary ruling.  She therefore has not shown that appellate counsel was ineffective for failing to raise this claim.

In sum, the prosecutorial misconduct claim was not a "dead-bang winner" nor was it clearly stronger than the issues presented on appeal.  Gamet therefore has not established cause or prejudice to excuse her procedural default.

### 2. Fundamental Miscarriage of Justice

Gamet has also not shown that failure to consider this claim would result in a fundamental miscarriage of justice.  That exception requires new, reliable evidence demonstrating that a constitutional violation likely resulted in the conviction of an actually innocent person. See Schlup v. Delo, 513 U.S. 298, 326-327 (1995). As discussed above in the context of the timeliness issue, Gamet makes no such showing. Indeed, the evidence presented at trial to prove her guilt was substantial.

Accordingly, Gamet's prosecutorial misconduct claim is barred by procedural default and does not warrant habeas relief.

### E.  Claim Three: Right of Confrontation

17

In her third claim, Gamet argues that the trial court improperly applied the doctrine of forfeiture by wrongdoing to several out-of-court statements and, consequently, admission of this testimony violated her Sixth Amendment right to confrontation.  Specifically, she challenges the testimony of Sheila Lorenz, Barbara Johnson, and Police Officer Corey Torbet.  Respondent argues that the Confrontation Clause is not implicated because the statements were non-testimonial.

The Michigan Court of Appeals held that this testimony was properly admitted under Mich. Comp. Laws § 768.27b, but did not address the Confrontation Clause claim.  To the extent that Gamet challenges the state court's application of state law, this claim is not cognizable on federal habeas review.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Out-of-court statements that are testimonial in nature are barred by the Sixth Amendment's Confrontation Clause unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court.  See Crawford v. Washington, 541 U.S. 36, 54, 63 (2004).  However, the Confrontation Clause is not implicated, and thus need not be considered, when non-testimonial hearsay is at issue. See Davis v. Washington, 547 U. S. 813, 823-26 (2006). Testimonial statements typically involve a solemn declaration or affirmation made for the purpose of establishing or proving some fact, such as a formal statement made to government officers. Id. at 826.  If a statement is not made "with a primary purpose of creating an out-of-court substitute for trial testimony," it is unlikely to be considered testimonial or to violate the Confrontation Clause. Michigan v. Bryant, 562 U.S. 344, 358 (2011).

**1. Sheila Lorenz**

18

Sheila Lorenz testified that she was a case manager at Home of New Vision, a substance abuse treatment facility.  She worked with individuals who had mental health or other disabilities in addition to substance use disorders.  Her job involved helping these individuals to set and realize their goals while reducing substance-use-related harm in their lives.  (Dkt. 22-14, PageID.1439.)

Lorenz worked with Marcel Hill in 2012 as part of this goal-setting process.  During those sessions, Hill discussed his relationship with Gamet, which he described as a significant part of his life and therefore relevant to his treatment goals.  In this context, Hill told Lorenz that Gamet had assaulted him and then sewn the resulting wound with a needle and thread.  (Id. at PageID.1445.)  Hill made these statements to gain therapeutic assistance and support in managing his life, not to not to create an out-of-court substitute for trial testimony.  Accordingly, the statements were nontestimonial.

### 2.  Barbara Johnson

Barbara Johnson, Hill's cousin, testified that, on March 8, 2013, Hill came to her house and reported that Gamet hit him in the head with a hammer.  This statement was nontestimonial because "statements made to friends or acquaintances are non-testimonial." United States v. Boyd, 640 F.3d 657, 665 (6th Cir. 2011).

Johnson later helped Hill prepare a written statement which was given to police.  Johnson read the statement and the statement itself was admitted into evidence.  The statement was prepared after police were called and with the primary purpose of establishing evidence against Gamet.  As such, it was testimonial.

Errors under the Confrontation Clause are subject to harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).  To determine whether a Confrontation Clause violation is harmless, a court considers: "(1) the importance of the witness' testimony in the prosecution's

case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross examination otherwise permitted; and (5) the overall strength of the prosecution's case." Jensen v. Romanowski, 590 F.3d 373, 379 (6th Cir. 2009) (citing Van Arsdall, 475 U.S. at 684).

Weighing these factors, the Court concludes that admission of the written statement was harmless considering the compelling evidence of Gamet's guilt, including the testimony of numerous other witnesses that Gamet previously physically abused Hill. The admission of the written statement was harmless.

### 3.   Police Officer Corey Torbet

Blackman Charter Township police officer Corey Torbet responded to the altercation between Gamet and Hill in March 2013. Officer Torbet testified that when he first arrived at the scene in response to the 911 call, Hill pointed to his head and told Torbet he had been struck in the head with a hammer. Hill's statement was made while Officer Torbet was assessing the situation to determine the need for medical assistance and to evaluate whether there was a continuing danger. It was nontestimonial because the primary purpose of Torbet's interaction with Hill at that point was "to enable police assistance to meet an ongoing emergency." Hammon v. Indiana, 547 U.S. 813, 822 (2006).

Moreover, even if the statement was testimonial, any error was harmless. Hill's statement, as related by Torbet, was isolated and did not identify Gamet as the perpetrator and, as discussed, the evidence implicating Gamet was substantial. Relief is denied on this claim.

### F.   Claim Four:   Ineffective Assistance of Counsel

Next, Gamet argues that defense counsel rendered ineffective assistance in multiple ways. To prevail on this claim, Gamet must show that the state court's denial of his claim was contrary

to, or an unreasonable application of, Strickland v Washington, 466 U.S. 668 (1984). As discussed above, Strickland established a two-prong test for claims of ineffective assistance of counsel: a habeas petitioner must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. See id. at 687.

The standard for obtaining habeas corpus relief is "difficult to meet." White v. Woodall, 572 U.S. 415, 419 (2014) (punctuation modified). Under Strickland, the standard is "all the more difficult" because "[t]he standards created by Strickland and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (internal citations and quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable"; but whether "there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

Gamet argues that defense counsel was ineffective for failing to properly prepare for trial, for indicating during opening statement that Gamet did not know who her attacker was at the time, for failing to impeach witnesses, for advising Gamet to give false testimony, and for failing to obtain Hill's medical, social security, and bank records. Gamet raised these claims in a pro per supplemental brief on direct appeal.[2]

The Michigan Court of Appeals denied this claim:

> We have reviewed each of these instances of alleged error and conclude that defendant's claim lacks merit. We hold that defendant has failed to overcome the presumption that defense counsel's actions were the result of sound strategy. As for defendant's claim that defense counsel advised her to perjure herself, we require more than defendant's bare assertion that counsel behaved so grievously. Moreover, as noted above, the evidence against defendant was overwhelming. Therefore, to the extent counsel's actions fell below the objective standard of reasonableness, defendant has not shown that the errors prejudiced her.

---

[2] On direct appeal, Gamet's ineffective assistance of counsel claim was more expansive than in her habeas petition. The Court addresses only the claims raised in the habeas petition and considers the omitted claims abandoned.

Gamet, 2016 WL 555850, at *19.

Gamet's ineffective assistance of counsel claims rest on speculation and unsupported assertions. First, she contends that counsel advised her to falsely testify that she did not know the identity of her attacker because, in his opening statement, counsel referred to the assailant(s) as "persons unknown" (Dkt. 22-11, PageID.1025). He asked her to lie so her testimony would be consistent with this statement. This allegation is entirely unsupported by anything other than Gamet's own allegation. Additionally, outside the presence of the jury, defense counsel and the trial court discussed at length the admissibility of evidence regarding Hill's prior acts of violence (See Dkt. 22-16, PageID.1730-44). During this colloquy, trial counsel repeatedly stated that he believed Gamet's testimony would be that she did not know who was attacking her until she turned the light on. Gamet did not challenge counsel's statements. Gamet's unsubstantiated claims are insufficient to overcome the strong presumption that counsel rendered reasonable professional assistance. See Wogenstahl v. Mitchell, 668 F.3d 307, 335-336 (6th Cir. 2012). ("[C]onclusory and perfunctory ... claims of [ineffective assistance of counsel] are insufficient to overcome the presumption of reasonable professional assistance and are insufficient to warrant habeas relief.").

Gamet provides no specific information about additional investigation counsel purportedly should have undertaken or what the investigation would have uncovered. See Clark v. Waller, 490 F.3d 551, 557 (6th Cir. 2007) (concluding that the petitioner could not show prejudice arising from counsel's failure to call a particular witness because he "offered no evidence, beyond his assertions, to prove what the content of [the witness's] testimony would have been").

Gamet presented no evidence to either the Michigan courts or this Court that Hill's medical, SSI, or bank records would have aided her defense. To prevail on her claim that counsel was ineffective for failing to obtain this evidence, Gamet would have to show that reasonable counsel

would have obtained this evidence and that she was prejudiced by trial counsel's failure. Gamet

has offered no substantial evidence as to how this evidence would have aided the defense. In the

absence of such proof, Gamet cannot demonstrate prejudice and therefore cannot satisfy the second

prong of an ineffective assistance of counsel claim. In addition, a review of the state court record

shows that counsel extensively cross-examined all prosecution witnesses.

Given the deferential standard of review applicable to ineffective assistance of counsel

claims and to the state court's disposition of this claim, Gamet fails to show that the state court's

decision was contrary to, or an unreasonable application of, Strickland.

## G. Claim Five:  Judicial Bias and Evidentiary Rulings

In her fifth claim, Gamet contends that the trial court was biased against her and violated

her right to present a defense. Specifically, she argues that the trial court demonstrated bias

through evidentiary rulings which favored the prosecution, through questioning of witnesses, and

during sentencing.[3]

The Michigan Court of Appeals denied this claim:

Judicial questioning of a witness is generally appropriate under MRE 614(b) to
"prevent unnecessary waste of time, or to clear up some obscurity" but "the judge
should bear in mind that undue interference, impatience, or participation in the
examination of witnesses, or a severe attitude on the judge's part toward witnesses
... may tend to prevent the proper presentation of the cause, or the ascertainment of
truth in respect thereto." Stevens, 498 Mich. at 174. The [trial court's questions] do
not reflect partiality.

Defendant argues that the judge "failed to remain impartial by showing favor to the
prosecution throughout the jury trial of the defendant by almost always ruling in
favor of the prosecution" and that "it appeared as though the prosecutor and the
trial court were working in union. Judge McBain repeatedly overruled the
objections of defense counsel, often times wrongly quoting the Michigan Rules of

---

[3] Respondent argues that this claim is procedurally defaulted. Procedural default is not a
jurisdictional bar to review the merits of a habeas petition. See Trest v. Cain, 522 U.S. 87, 89
(1997); Hudson v. Jones, 351 F.3d 212, 215 (6th Cir. 2003) ("[F]ederal courts are not required to
address a procedural default issue before deciding against the petitioner on the merits.").

Evidence in support of these rulings ..." However, "[t]he mere fact that a judge ruled against a litigant, even if the rulings are later determined to be erroneous, is not sufficient to require disqualification or reassignment." In re Contempt of Henry, 282 Mich.App 656, 680; 765 NW2d 44 (2009). We have already concluded that the trial court's admission and exclusion of evidence in this case was not an abuse of discretion.

We do acknowledge some intemperate remarks the trial court made during defendant's sentencing. During the sentencing hearing, defendant interrupted the victim's aunt, who was providing a victim impact statement. The trial court warned defendant to be quiet or he would have the court officer duct tape her mouth shut. The prosecutor noted: "[Y]ou and I both know how long I've been doing this and how many murder trials I've had, I have never had a convicted murder[er] stand before her court on the day of sentencing laughing and lip jacking anybody who will listen, including you....I can't believe she stands before you doing this this morning." The trial court indicated:

> And you know what, I's [sic] the only one in the courtroom that knew what kind of knife that was. And it was a big old long filet knife. Because I—I use it to—I used to filet pike and muskie and salmon, and I'll tell you, you gutted him like a fish in that apartment too. You were relentless. You stabbed, you stabbed, you stabbed, you stabbed, you stabbed until he was dead.

> You didn't think he was an intruder. You know, maybe one stab wound, okay. Maybe that's self-defense, but you—you put in 11 more to make sure he was good and dead. So I hope—I agree with the family, I hope you die in prison as well. You know, and if this was a death penalty state you'd be getting the chair.

"Comments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality." Jackson, 292 Mich.App at 598. Moreover, these comments were made at defendant's sentence. The trial court could not have deprived her of a fair trial because the comments were made only after the jury handed down its verdict.

Gamet, 2016 WL 555850, at *17.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant a fair trial before an impartial tribunal. See Bracy v. Gramley, 520 U.S. 899, 904-905 (1997). Trial judges have wide latitude in conducting trials, but they must avoid conduct that conveys to the jury the impression that the judge believes that the defendant is guilty. Brown v. Palmer, 358 F. Supp.

24

2d 648, 657 (E.D. Mich. 2005). A trial judge's intervention in the conduct of a criminal trial must be significant both in its extent and the degree to which it is adverse to the defendant before habeas relief will be warranted. McBee v. Grant, 763 F.2d 811, 818 (6th Cir. 1985). This is because the Supreme Court has ruled that "expressions of impatience, dissatisfaction, annoyance, and even anger" do not establish judicial bias or misconduct. Liteky v. United States, 510 U.S. 540, 555-556 (1994). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Id. at 555 (1994).

Here, the Michigan Court of Appeals reasonably concluded that the trial court's conduct did not demonstrate bias. A judge may interject himself "into the trial, speak to counsel, and question witnesses in order to … aid in its orderly presentation." United States v. Powers, 500 F.3d 500, 511 (6th Cir. 2007). The record reflects the trial court's efforts to manage the proceedings efficiently, not hostility to the defense or alignment with the prosecution. See Liteky, 510 U.S. at 556 ("A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune."). Here, the trial court's questioning of witnesses and evidentiary rulings did not show "hostility to one of the parties or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the Court with one of the parties for the purpose of furthering or supporting the contention of such party." Todd v. Stegal, 40 F. App'x 25, 28 (6th Cir. 2002)(punctuation modified).

Moreover, the trial court instructed the jury that its comments, rulings, and questions were not evidence and that the jurors alone were responsible for deciding the facts. (See Dkt. 22-17, PageID.1934-35.) Such instructions mitigate any potential risk of prejudice.

25

Given this record, the Michigan Court of Appeals' rejection of Petitioner's judicial-bias claim was not contrary to, nor an unreasonable application of, clearly established federal law. Under the deferential standard imposed by AEDPA, habeas relief is not warranted on this claim.

### H. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. See Slack v. McDaniel, 529 U.S. 473, 484–85 (2000). When a district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claims, a certificate of appealability should issue if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. Id.

The Court declines to issue Gamet a certificate of appealability because reasonable jurists would not find it debatable whether the Court was correct in determining that Gamet's first claim was filed outside of the one-year limitations period and that her remaining claims are meritless.

### III. CONCLUSION

For the reasons set forth above, the Court denies the petition for writ of habeas corpus and declines to issue a certificate of appealability.

The Court grants Petitioner leave to proceed in forma pauperis on appeal because an appeal could be taken in good faith. See Fed. R. App. P. 24(a).

**SO ORDERED.**

Dated: March 16, 2026                      s/Mark A. Goldsmith
Detroit, Michigan                          MARK A. GOLDSMITH
                                       United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 16, 2026.

                                     s/Joseph Heacox
                                      JOSEPH HEACOX
                                      Case Manager